PLAINTIFFS' EXHIBITS

1. A + B  NO PARKING SIGNS

2.     TOOK NORMAN BOLDUC TO COURT FOR GOLFCART ON MY PROPERTY

3.     COPY OF MALONEYS' SIGN SHE PLACED ON MY HOUSE

4.     MALONEY CALLED THE HEALTH INSPECTOR TO COMPLAINT ABOUT MY SEPTIC

5.     MAILBOXES -

6.     POLICE OFFICER KEATON, TOOK LETTER TO MALONEY- CAME TO COURT TO VERIFY THAT MALONEY HAS BEEN HARASSING PLAINTIFF FOR YEARS.

7.     ATTORNEY HANSON'S LETTER TO BOLDUC

8.     TRANSCRIPT OF COURT HEARING FOR STALKING ORDER

9.      MY LETTER TO BOLDUC

10.      FINAL STALKING ORDER

11.     DEFENDANTS AT POLICE STATION

12.     COURT HEARING FOR VIOLATION OF STALKING ORDER

13.     CASE DISMISSED

14.     JUDGE REMOVED "RELATIVES'" FROM STALKING ORDER

15.     PICTURES OF MALONEYS' CAR BLOCKING PLAINTIFFS' DRIVEWAY.

16.     MEANING OF FAMILY

17.     SAME CASE - ALREADY FILED - DIFFERENT DEFENDANTS

PLAINTIFF'S
EXHIBIT
_1 - A_

*Exhibit T*

BOARD OF SELECTMEN
Paul R. Hatch, Chairman
Earl L. Keniston
Shirley E. Ganem

TOWN MANAGER
Paul J. Skowron

*Town of*

# Wolfeboro

September 4, 2001

Mr. William Lambert
State Bureau of Traffic
Route 106
220 Sheep Davis Road
Concord, NH 03301

Dear Mr. Lambert:

Please find attached the following:

1. Letter dated July 17, 2001, directed to Josephine Amatucci from Randy Talon, District 3, Bureau of Highway Maintenance.

2. Letter dated August 8, 2001, directed to Randy Talon, District 3, Bureau of Highway Maintenance from the Wolfeboro Town Manager.

3. Letter dated August 9, 2001, directed to the Wolfeboro Town Manager from Randy Talon, District 3, Bureau of Highway Maintenance.

From your review of the above correspondence, please be advised that the Wolfeboro Board of Selectmen are requesting the State Department of Transportation to install no parking signs along Ms. Amatucci's property on Route 109.

If you have any questions, please do not hesitate to contact me.

Cordially,

Paul J. Skowron
Town Manager

Attachments

cc: Board of Selectmen w/o attachments
    Josephine Amatucci w/o attachments ✓
PJS/acm



*84 South Main Street   Post Office Box 629   Wolfeboro, New Hampshire 03894*
*(603) 569-8161   Fax (603) 569-8167*



# THE STATE OF NEW HAMPSHIRE
## DEPARTMENT OF TRANSPORTATION

### CAROL A. MURRAY, P.E.
### COMMISSIONER



PLAINTIFF'S
EXHIBIT
B

August 18, 2003

Josephine Amatucci
P.O. Box 272
Wolfeboro Falls, N.H.  03896


RE:  Driveway Status
        Route 109 Wolfeboro


Dear Ms. Amatucci,

This letter is a follow up of our telephone conversations we have had in the past week. The main focus was whether or not you have a legal driveway.

You have a grand-fathered driveway for the land that you currently own and abuts Route 109. This driveway existed before the statutory authority RSA 236:13 became effective July 1, 1971. Your driveway is the access from Route 109 to your home and no one can block your driveway.

Hopefully this answers any questions you had.

Sincerely,

Mark P. Morrill, P.E.
District Engineer


cc: Wolfeboro PD
     Marty Bilafer
     Kenneth Kyle
     Stephen Gray
     William Lambert

# The State of New Hampshire

01-E-154

**ORDER ON DOCUMENT NO. _____**

PLAINTIFF'S EXHIBIT
2

Exhibit

NORM

      After considering the evidence and arguments presented, including photographs, the court concludes that the defendants have been parking their golf cart on the plaintiff's property. Accordingly, the following order is entered:

    1. The defendants are restrained from parking their golf cart on the plaintiff's property as depicted in the photographs.

    2. The defendants may use the shoulder of the highway if permitted by the State, but may not cross through the plaintiff's private driveway.

RULINGS + FINDINGS OF DEFENDANT:

Granted: 1-7, 9, 12, 15, 16

Denied: 8, 10, 11, 13, 14, 17-19.

Ex. A.1
      (o

9/10/01
Date

_____
Signature
Presiding Justice

ORDER

# Bitch Parking

# Only



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

3

Exhibit





BUILDING DEPARTMENT

## Town of
## *Wolfeboro*

# MEMORANDUM

Date :          September 15, 2003

To :            Paul J. Skowron, Town Manager

From :          David A. Senecal, Health Inspector

Re :            Josephine Amatucci
                TM#  151-21

---

I inspected the property of Josephine Amatucci at 350 Governor Wentworth
Highway at 4 :20 pm Friday, September 12, 2003.  I saw no problems with the
septic system.  There were no smells and no visual outbreak.



*9 Union Street    Post Office Box 629    Wolfeboro, New Hampshire 03894*
*(603) 569-5970*

INCORPORATED 1770

PLAINTIFF'S
EXHIBIT

5

PENGAD 800-631-6989

**MAILBOXES - SEE #8**

# THE STATE OF NEW HAMPSHIRE



**PLAINTIFF'S EXHIBIT**
6-A

CARROLL, SS _____        DISTRICT COURT FOR SOUTHERN
                                   CARROLL COUNTY

### SUBPOENA

**TO:** *OFFiceR Scott MooRe*
**ADDRESS:** *C/o WOLFeBORO PoLicE DePT.*
**SOCIAL SECURITY NO.:**

**You are required** to appear at the DISTRICT COURT FOR SOUTHERN
CARROLL COUNTY, RTE 171 OSSIPEE, NH on *JuLY 10, 2003*
at *11:00* am/pm to testify to what you know relating to the
case between *PLAiNTiF JOSEPHiNe AmaTucci* _____ and
*MR. & MRS. ROBERT MALONEY* _____ . *Case # O3CVO92*

You are further required to bring with you and produce at the time
described          above          the          following:
_____ .

**IF YOU FAIL TO APPEAR AS REQUIRED BY THIS SUMMONS, you will be
subject to the penalties prescribed by law which may include
arrest.**

Dated at *7/9/03* this _____ day of _____ , 2000

Justice of the Peace *Priscilla Keaton* [signature]

**PRISCILLA C. KEATON**
**Justice of the Peace**
My Commission Expires on Jan. 4, 2006

ISSUED AT THE REQUEST OF: *Josephine Amatucci*
Phone:

### RETURN OF SERVICE

I have served a copy of this subpoena to the above name
*OFFiceR Scott MooRE* on the *9th* day of *JuLY* _____ ,
~~2000~~ at *1/15* am/pm.
*2003* *Josephine Amatucci*

NOTE: THE ISSUING PARTY IS RESPONSIBLE FOR PAYMENT OF ALL FEES
INCLUDING MILEAGE AS REQUIRED BY LAW.

FEES PAID BY THE STATE OF NEW HAMPSHIRE ARE PAYABLE THROUGH THE
OFFICE OF THE ATTORNEY GENERAL, and submitted by this office on a
monthly basis.

Mrs. Pauline Maloney
188 Stoneham Road
Wolfeboro, New Hampshire 03894

Dear Pauline:


This letter is to advise you that I do not want you anywhere near my property, I do not want you
Parking your car in front of my property, and  I do not want you anywhere near my side road with
The exception of riding down the road, without stopping, to visit your relatives.

You are not allowed to back up to turn around on my side road like you have been doing all along,
Even though I have asked you  not to back your car on my private road.  You have no right to
Park or  back up anywhere near my property, that includes in front of my driveway and on
The side road, or anywhere near my property.  You are trespassing,

Let this letter be a warning that if you do not stay away from my property I will move forward
With Legal action and have the law stop you from trespassing.  This will be your last chance.

                          Josephine Amatucci

PLAINTIFF'S
EXHIBIT
2

# HANSON LAW OFFICE

51 Mill Street, 11 Bayside Village Prof. Bldg.
P. O. Box 2014
Wolfeboro, New Hampshire 03894-2014
TEL. (603) 569-6682 / FAX (603) 569-5982

Jon S.B.C. Hanson, Esquire
*Admitted to practice in NH and MA*

November 10, 2003

Mr. and Mrs. Norman Bolduc
61 Lawrence Street
Danvers, MA 01923

*Exhibit*

    RE:    removal of outbuildings

Dear Mr. and Mrs. Bolduc,

    I have recently met with Josephine Amatucci regarding your destruction and removal of two (2) outbuildings which Ms. Amatucci claims belonged to her.

    In reviewing the assertion made by Ms. Amatucci and the documentation I have reviewed I believe Ms. Allen has a strong case. I base my opinion on the following:

        A.    Plan entitled "Plan of Boundary Line Adjustment Involving Lands of Ron Kennis and Normand and Lois Bolduc." This plan clearly evidences two structures which are identified as "outhouses".

        B.    A deed from Elizabeth McKenzie to Eugene Head which evidences as easement for accessing a well and the outbuildings which are evidenced on the Plan referred to in paragraph 'A' above.

        C.    Notes of a discussion between Ms. Amatucci and you wherein it is asserted that you acknowledged to Ms. Amatucci that 1. you did have the outbuildings torn down, and 2. you were advised to take said action by your insurance company.

    Your actions are viewed by Ms. Amatucci as being an extension of previous actions which she perceives to be aggressive, mean spirited, and in violation of her property rights. There is no doubt in my mind that your actions were done 1. without permission from Ms. Amatucci, and 2. in contradiction to her property rights as set forth in the deed referred to in paragraph 'B' above.

    In addition to setting forth the foregoing Ms. Amatucci hereby goes on record of advising that your unilateral actions are not construed or accepted by her as being a legal reduction or elimination of the rights she acquired by virtue of the appurtenant easements granted in the aforementioned deed despite the fact that your actions have in fact directly and significantly interfered/prevented her from using and maintaining the buildings.

Ms. Amatucci tells me that there are two (2) possible solutions which would be acceptable to her. The first would involve you/your agents reconstructing the outbuildings in the same location an din substantially the same configurations. The second solution would be a payment of $1,500.00 to Ms. Amatucci and she would release her rights (relative to the use and maintenance of the outbuildings. Please give this matter your consideration and let me know your thoughts on or before December 1, 2003.

My understanding is that Ms. Amatucci will seek Court intervention if a satisfactorily resolution is not reached on or before December 31, 2003.

Very truly yours,


Jon S.B.C. Hanson

JSBCH:clp

THE STATE OF NEW HAMPSHIRE

PLAINTIFF'S
EXHIBIT
8

CARROLL, ss                                    SUPERIOR COURT

\*   \*   \*   \*   \*   \*   \*   \*   \*

Josephine Amatucci          \*     03-E-080 and 03-E-081

              v.            \*

Pauline Maloney             \*

          and               \*

Pauline Maloney             \*

              v.            \*

Josephine Amatucci          \*

\*   \*   \*   \*   \*   \*   \*   \*   \*

### FINAL HEARING/STALKING

Before:     Honorable JAMES D. O'NEILL, III,
            Presiding Justice, Superior Court,
            Carroll County Superior Court,
            Ossipee, New Hampshire,
            on November 12, 2003.

APPEARANCES

For the Petitioner:     Josephine Amatucci, Pro se

For the Respondent:     Pauline Maloney, Pro se

Clerk:                  Samuel Farrington, Esq.

Official Court Reporter: Theresa M. Vadala, RMR

P R O C E E D I N G S

1

2      THE COURT:  Pauline Maloney v. Josephine

3  Amatucci and Josephine Amatucci v. Pauline

4  Maloney.  Docket numbers on these matters 03-E-080

5  and 03-E-081.  Okay.  The parties stand and

6  identify themselves for the record.

7      MS. AMATUCCI:  Josephine Amatucci.

8      MS. MALONEY:  Pauline Maloney.

9      THE COURT:  Why don't you both be seated if you

10  would.  Okay.  What's before the Court is a final

11  hearing on the stalking petitions.  In reference

12  to docket 03-E-080 this is in reference to a

13  stalking petition that was filed with the District

14  Court on or around 8/6/03.  In reference to docket

15  03-E-081 this is in reference to a stalking

16  petition that was originally granted by the

17  District Court and that docket was filed on or

18  around 7/1/03 as well.

19      And it appears that -- I can't read the writing

20  -- I believe it's Judge Varney -- indicated that

21  apparently there was an interest in real estate

22  raised as well.  I am not sure how that involves

23  the stalking petition.

1    Ms. Amatucci, why don't you tell me what brings

2    you to court today.

3    MS. AMATUCCI:  I live across the street from

4    Lake Wentworth, Your Honor.

5    THE COURT:  Okay.

6    MS. AMATUCCI:  On a small local beach and I

7    have owned my property for 12 years.  I have a legal

8    driveway that I use to access my property.  For the

9    past two and a half years Ms. Maloney who lives

10   next-door has been blocking my driveway along with

11   her husband.  They started blocking my driveway in

12   retaliation because of an incident I had with her

13   grandson.  He was driving his golf cart on my lot

14   all hours of the day and night.  I had to call the

15   police and the police stopped him.  I tried in

16   vain to have the police ticket her but they did

17   not do so.  They have told her countless times to

18   remove her car.  But when they leave, she comes

19   back.  Up to five times a day she parks and blocks

20   my driveway and I can't get her away.  Officer

21   Moore repeated this at District Court to verify

22   that I have been having trouble with her for two

23   and a half years.

1   I am very, very upset with her offending

2   nature, her offending behavior.  She has an

3   obsession to get me, to make me nervous, to upset

4   me.  She blocks my driveway intentionally and in

5   doing so she is violating state law.  She is

6   denying me my right to enjoy my property, and she

7   has no right to be there.

8   Mrs. Maloney made my life a living hell.  She

9   stirred up the beach people against me.  She tells

10  them park in my lot because they have a right to

11  park there.  She has filed many, many complaints

12  about me to the town office.  The latest just a

13  couple of weeks ago.  She claimed that my septic

14  system was in failure to them.  I had to endure

15  inspection by the Town.  Even though they didn't

16  agree with her, they had to do the inspection.

17  They told me it was she who put the complaint in

18  and that she was driving them crazy about

19  complaints with me.  And that is -- that's it in a

20  nutshell.

21  I do want to add I never bother her.  I never

22  bothered any of the people on the beach.  I never

23  bother anyone.  I stay in my house.  I don't even

 1        go to the beach, and it's only across the street.

 2        She is sitting on my lot when I am home.  I don't

 3        bother -- I never bother anyone.

 4            THE COURT:  Okay.  Thank you, ma'am.

 5        Mrs. Maloney, you are here and have cross

 6        complaints for stalking.  Why don't you tell me

 7        what brings you to court today.

 8            MRS. MALONEY:  First of all, Your Honor, it's

 9        public parking on both sides of the road.  She

10        does not have a driveway cut in front of her

11        building.  She has been told the driveway is to

12        the left of the building and it's a right-of-way.

13        She cannot block -- the driveway is behind the

14        building.  I have been parking in this area -- I

15        have a camp right -- not next-door -- about 100

16        yards from her and I park there because it's

17        public parking.  I carry things to the beach.

18            I have a letter that goes back to 1953 that

19        states it's a three rod road, and I have pictures

20        of the area we are talking about if you would like

21        to look at them.

22            THE COURT:  Why don't you just tell me about

23        them.

6

MS. MALONEY:  We have had two or three

selectmen meetings because she wanted no parking

put up, and the State and the Town refuse to put

4    no parking signs on either side of the road

5    because the public uses the beach and it's -- the

6    shoulder of the road is very wide.  People can

7    pull over, and besides parking their car, they can

8    still walk on the shoulder of the road.  She

doesn't want any parking in front of her building.

She doesn't have a legal driveway anyway.  I have

11   been parking there for 20 years.  And now she has

12   put a mailbox out there so nobody -- that is on

13   the shoulder of the road and nobody can pull over

14   and it's public parking.  The selectmen and the

15   State will not put up no parking signs that she

16   had requested.

17       And I've never gone on her property and I don't

18   have people on the beach against her.  I have

19   never spoken to them.  They all have their own

20   opinions.  She does come out of the house.  She

21   comes after people when they park in the driveway

22   or in front of her place on her driveway screaming

23   at everybody to move their car.  She has called

LASER STOCK FORM

CORBY USA, LLC   1-800-255-5040

*You have jurisdiction on what really happened*

1    the police all the time.  Nothing they can do

2    because I am legally parked or anybody else.  It

3    is not just myself.  She has harassed everybody.

     She did over $2,000 damage to a car that was

     parked there.  She put cylinder blocks up in the

5    fender of the car.  She attacked my friend.  They

6    wanted to come to court but they were out of state

7    and could not make the court date so it was

8    dismissed.  But she has done all that damage.  She

9

10   does come out.  She attacks people.  And, you

11   know, I want to put a stop to this and have a

12   court order to have her never talk to me or my

13   family again and also the Court to order her to

14   move those mailboxes.  She has one address.  She

15   has two mailboxes there with one address.  And I

16   have a letter from the Planning Board to state she

17   has one address and because she -- it's a hazard

18   now.  She is blocking traffic.

19        THE COURT:  Okay.  Now, Mrs. Maloney, I assume

20   you would have no objection to the following

21   order.  That in fact Ms. Amatucci not have any

22   contact or communication with you whatsoever or

23   your -- members of your family.  You wouldn't

1    disagree with that.

2        MS. MALONEY:  No, I wouldn't.

3        THE COURT:  In turn, you would be enjoined from

4    having any communication or contact with her or

5    her family.

6        MS. MALONEY:  I never speak to her.

7        THE COURT:  Okay.  Ms. Amatucci, do you have

8    any objection to that particular provision?

9    Please stand if you would.  Stand please.

10       MS. AMATUCCI:  Sure.  I am sorry.

11       THE COURT:  In other words, you would stay --

12   you would have no contact or communication with

13   Mrs. --

14       MS. AMATUCCI:  Oh, definitely.  I never have

15   contact with her.  Sure.

16       THE COURT:  Let me finish my question.  You

17   would have no objection to Mrs. Maloney no contact

18   or communication with either her --

19       MS. AMATUCCI:  Yes.

20       THE COURT:  -- or a member of her family.  You

21   would have no contact or communication.

22       MS. AMATUCCI:  Yes.

23       THE COURT:  Do you have any objection to that?

LASER STOCK FORM A

CORBY USA, LLC  1-800-255-5040

1    MS. AMATUCCI:  No.

2    THE COURT:  As far as moving the mailbox, that

3    goes well beyond the stalking petition that you

4    two have filed.  So only coming out of today's

5    hearing is a reflection of the agreement between

6    you two; that is, you stay away from her; she will

7    stay away from you; and have no communication.

8    MS. AMATUCCI:  I think it should be more than

9    that, Your Honor.

10   THE COURT:  Excuse me.

11   MS. AMATUCCI:  She claims that the State --

12   that everybody agreed that I have a legal driveway

13   and you didn't read the papers there.  I think she

14   should know that and I think that you should tell

15   her that.  I have copies of the papers here.  She

16   is all mixed up.  The Town agreed to install no

17   parking signs and the DOT, Department of

18   Transportation, there is a letter there saying

19   that that is a legal driveway, and nobody can

20   block it out.  She doesn't know that.

21   MS. MALONEY:  Yes, I do, because I have a copy

22   of that letter.

23   THE COURT:  Excuse me.  Have you completed your

LASER STOCK FORM A

CORBY USA, LLC  1-800-255-5040

1    comments, Ms. Amatucci?

2        MS. AMATUCCI:  Yes.

3        THE COURT:  Okay.  Mrs. Maloney, anything else?

4        MS. MALONEY:  No, sir.

5            (An unidentified person started to talk.)

6        THE COURT:  These are the two parties,

7    Mrs. Maloney, anything further?

8        MS. MALONEY:  Yes.

9        THE COURT:  What have you got to say.

10       MS. MALONEY:  Yes, Your Honor.  She has smashed

11   a car.  We don't want anymore grieve from her.

12   She is dangerous now.  She's been a nuisance for

13   several years.  She is dangerous now.  Next time

14   she opens her mouth, let's go to court.  Let's end

15   this nonsense.  The last time she went after

16   somebody.  This has got to stop.  That's a state

17   highway.  It is not her property.  Can we define

18   her property before this hearing is over?

19       THE COURT:  No.  This is not a hearing on any

20   definition of property.  All it is, you filed a

21   domestic -- you have filed a stalking petition and

22   Ms. Amatucci has filed a stalking petition.  If

23   you want to go into details and things like this,

11

1    it is an entirely different pleading.  What I have

2    before me is two stalking petitions which it

3    appears you both agree to.

4        Anything else, Ms. Amatucci?

5        MS. AMATUCCI:  If it's as simple as that...

6        THE COURT:  Mrs. Maloney.

7        MS. MALONEY:  Well, the problem is we live in

8    Wolfeboro.  We may be in line at the supermarket.

9    It is kind of difficult to stay away from one

10   another.  But I don't want her saying anything to

11   me anywhere anytime.

12       MS. AMATUCCI:  Never do.

13       THE COURT:  Excuse me.  Only one is going to

14   talk.  One at a time.  The way the order is going

15   to read is:  By agreement of the parties they are

16   to have no contact or communication with each

17   other.  I understand you both live in Wolfeboro.

18   If you see each other in the supermarket in one

19   line, she will go to the other.  Have no contact.

20       MS. MALONEY:  My question is about parking if

21   she comes after me again.

22       THE COURT:  That's contact.  You -- and that

23   would be a violation of the order.

LASER STOCK FORM A

CORBY USA, LLC  1-800-255-5040

1      MS. AMATUCCI:  Okay.  As far as respective

2    parking rights or title to the property --

3      THE COURT:  That is an entirely different

4    question.  That is not within the purview of the

5    two stalking petitions that have been transferred

6    from the District Court without ruling.  Judge

7    Varney made some reference to title but that's --

8    this is not the day to hear that.  You can file

9    other pleadings that are necessary if you feel

10    your respective rights concerning parking and

11    property rights are in question.  A stalking

12    petition is not the vehicle to get that question

13    before the Court.

14      MS. AMATUCCI:  We were missed  --- we were

15    misinformed.  The police told me to do it that way

16    and I -- and I went to somebody --

17      THE COURT:  First of all, ma'am, I told you

18    once if you address the Court you are expected to

19    stand.  You were told that.

20      MS. AMATUCCI:  I realized right away the police

21    misinformed.  Right away I went to the police

22    department to change it, and they said they couldn't

23    change it.

1    THE COURT:  Well, ma'am, at this point you can

2    file any pleadings you have with the Clerk of

3    Court upstairs.  As to the police and District

4    Court, you are in a different court now.  Again,

5    if you want to review your respective rights

6    concerning some driveway and parking --

7        MS. AMATUCCI:  Yeah.

8        THE COURT:  -- apparently the Town will be

9    involved as well, it will necessitate different

10   pleadings than what is before the Court which are a --

11       MS. AMATUCCI:  What a waste of time.

12       THE COURT:  -- stalking petition.  Both of you are

13   going to agree to stay away from each other.

14       MS. AMATUCCI:  She can't come in front of my

15   driveway.

16       THE COURT:  No, ma'am.  It doesn't -- no

17   contact or communication.  As to the respective

18   rights of the driveway, that is not within the

19   purview of the court.

20       MS. AMATUCCI:  What a waste.  I can't believe

21   it.  This is like wasted time.  I cannot stand

22   having these people on my back.

23       THE COURT:  Thank you very much.  You will be

14

1   getting a court order but you all understand what

2   it says.  You all have a nice day.  Thank you.

3   Court in recess.

4       THE BAILIFF:  Rise for the court, please.

5           (Whereupon, the hearing concluded.)

6               *  *  *  *  *  *  *  *

7                   CERTIFICATE

8       I, Theresa M. Vadala, Certified Shorthand

9   Reporter in and for the State of New Hampshire and

10  the New Hampshire Superior Court System, do hereby

11  certify that the foregoing transcript, as reduced

12  to computer type under my supervision, is a

13  transcription of my stenographic notes to the best

14  of my knowledge, skill, ability and belief.

15

16

17

18

19

20

21

    Date: 1/7/04

22                              Theresa Vadala
                                Theresa M. Vadala, RMR

23

EXHIBIT 9



PLAINTIFF'S
EXHIBIT
9

NOVEMBER 13, 2003

Mr. Norman Bolduc:

As you know I am very upset that you destroyed my two "OUTHOUSES" structures, that were in the back of my house. Although the two "OUTHOUSES" were sitting on your land they were there long before you bought the land and as you are well aware I own them, I use them and I have a legal right to keep them there, and the legal right to use them. YOU HAD NO RIGHT TO DESTROY THEM AND TAKE THEM AWAY.

I am therefore demanding that you pay an amount of $1,000.00 for the loss of the "OUTHOUSES" that you destroyed and removed.

You said you was sorry, but you have to pay for my loss. Besides, from my experience with you in the past I know you as a neighbor who doesn't care about me or my feelings or how upset I would be with your actions. You are not sorry.

If I do not receive the $1,000.00 by November 30, 2003 I will give this case to my lawyer and take you to court for damages, and we will also make you pay for legal fees incurred.

JOSEPHINE AMATUCCI
P. O. BOX 272
WOLFEBORO FALLS, N.H. 03896

P.S: TO ADDRESS THE GOLFCART SITUATION, YOU TOLD ME YOUR SON LEFT THE GOLFCART ON THE ROAD, COME ON NORMAN, YOU KNOW HOW MANY TIMES I ADDRESSED YOU ABOUT NOT LEAVING THE GOLFCART ON THE ROAD, I EVEN ASKED THE POLICE TO TALK TO YOU. DO YOU REALIZE WHAT LEGAL LIABILITY I WOULD HAVE IF SOMEONE HAD AN ACCIDENT TURNING ON THAT ROAD AND HAD AN ACCIDENT, BECAUSE OF YOUR GOLFCART. PARKED THERE, YOU CAUSED ME GREAT EXPENSES TO GET YOUR GOLFCART OFF MY ROAD, I HAD TO GET LEGAL COUNSEL AND I HAD TO PAY FOR A SURVEY OF THE PROPERTY LINE, IN ORDER TO PRESENT MY CASE TO COURT PROPERLY. NOT TO MENTION THE SADNESS IN MY HEART THAT I HAVE SOMEONE LIKE YOU AS A NEIGHBOR.

# THE STATE OF NEW HAMPSHIRE
## Carroll Superior Court
Courthouse Square, Route 171
P. O. Box 433/Ossipee Village
Ossipee, NH 03864
603 539-2201

### NOTICE OF DECISION



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
_10_

JOSEPHINE AMATUCCI
PO BOX 272
WOLFEBORO FALLS NH 03896

03-E-0081 Josephine Amatucci v Pauline Maloney

Enclosed please find a copy of the Court's Order dated 11/12/2003
relative to:

**Final Order on Stalking Petition**

11/13/2003                          Samuel Farrington
                                    Clerk of Court

cc:  Pauline Maloney
     Wolfeboro Police Department

AOC Form SUCP050 (Rev. 09/27/2001)

THE STATE OF NEW HAMPSHIRE

CARROLL, SS.                                            SUPERIOR COURT

Josephine Amatucci

v.

Pauline Maloney

03-E-081

and

Pauline Maloney

v.

Josephine Amattuci

03-E-080

## ORDER

Hearing held on the two (2) pending Stalking Petitions submitted by the respective parties in the District Court which were transferred without Rulings to the Court by Order (dated 7/10/03-Varney-J.).  Subsequent to offers of proof by the parties, representing themselves pro se, the Court renders the following determination(s).

At the agreement of the parties (see record), the following provision is directed:

1) That the parties are enjoined from having <u>any</u> contact or communication with the other respective party by <u>any</u> means or with that parties' relatives or members of that parties' household.  This Order shall remain in effect pending further Order of the Court.

2

In reference to the question(s) of parking and/or the property rights of the respective parties to the disputed area on Route 109 including the parameters of the "grand-fathered" driveway of Josephine Amatucci, the Court does not have before it sufficient equity pleadings to determine this question(s).  Accordingly, no finding on same is rendered.

So Ordered.

Date  11/11/03

James D. O'Neill, III
Presiding Justice

PLAINTIFF'S
EXHIBIT
//

# THE STATE OF NEW HAMPSHIRE
## CARROLL, SS
## SUPPORTING AFFIDAVIT for Request to ISSUE ARREST WARRANT

December 0**1**, 2003                                              WPD #03-453

I, James O'Brien being duly sworn, depose and say:

1. I am a Patrolman, Wolfeboro Police Department

I herewith make application for the issuance of an Arrest Warrant against the defendant:

**Josephine S Amatucci, DOB: 09/27/1938**
**of 350 Gov Wentworth Hwy, Wolfeboro NH  03894**

2. I have information that a crime (or offense) has been committed by the defendant as follows:

   1.  On November 17, 2003, at approximately 12:04 p.m., I spoke with NORMAN BOLDUC (1-21-1932) and his sister PAULINE MALONEY 04-10-1935) in the lobby of the Wolfeboro Police Department in regards to a violation of a Stalking order by JOSEPHINE AMATUCCI (9-27-1938.)

   2.  MALONEY told me that on November 12, 2003, she and AMATUCCI went before JUDGE JAMES O'NEIL at the Superior Court in Ossipee in regards to a hearing on a Stalking Order.  The order that was made effective on November 12, 2003, stated in paragraph 1 the following:

   "That the parties are enjoined from having any contact or communication with the other respective party by any means or with that parties' relatives or members of that parties' household. This Order remains in effect pending further Order of the Court." (Please see order.)

   3.  BOLDUC received a certified mail letter and an uncertified mail letter addressed to him from AMATUCCI on November 15, 2003 at approximately 3:00 p.m. Both letters are the same exact letter. (Please see letter and envelopes.) Apparently AMATUCCI was making sure the letter reached him. The letter is a clear violation of the order in that Bolduc is a "relative" of MALONEY, being the brother of MALONEY.  BOLDUC owns the property directly behind the property of AMATUCCI.  The reason for her writing the letter is to demand that BOLDUC pay her the sum of $1000 for two outhouses that were on his property.  The outhouses were destroyed by BOLDUC on the recommendation of his homeowner's insurance company because of the fact they were on wetlands and they were unsafe.

   4.  AMATUCCI threatens BOLDUC with legal action if he does not pay



# THE STATE OF NEW HAMPSHIRE
## CARROLL, SS
## SUPPORTING AFFIDAVIT for Request to ISSUE ARREST WARRANT

December 02, 2003                                            WPD #03-453

her the $1000 by November 30, 2003.  BOLDUC and his wife are now in
fear of being sued by AMATUCCI for removing two outhouses that were
on his own property.

5.  MALONEY said that the order was made clear to AMATUCCI by JUDGE
O'NEIL in the courtroom.  It is apparent that AMATUCCI wrote the
letter to BOLDUC knowing full well that she had violated the court
order.

6.  AMATUCCI has violated NH RSA 173:B-9 (Violation of Protective
Order), in that she contacted Mr. BOLDUC knowing that she was
ordered by the court to cease contact with any member of the
Maloney family.

. Based upon the foregoing information (and upon my personal knowledge) there is
probable cause to believe that the defendant did commit a crime (or offense) as above
stated.

Therefore, I request that the court issue an arrest warrant and order a duly
authorized officer to take the defendant and bring him before the court having
jurisdiction.

_James R. O'Brien_
_____
Name

When personally appeared the above named James O'Brien and made oath that the foregoing
affidavit by him subscribed is true.

Before me this _____ 2 _____ day of December _____ 2003

Justice of the District Court for Southern Carroll County
or Justice of the Peace

On November 17, 2003, at approximately 12:04 p.m., I spoke with

NORMAN BOLDUC (1-21-1932)
61 Lawrence Street
Danvers, MA 01923
978-774-2833

and his sister

PAULINE MALONEY 04-10-1935)
P.O. Box 622
Wolfeboro Falls, NH 03896
569-6272

in the lobby of the Wolfeboro Police Department in regards to a violation of a Stalking order by

JOSEPHINE AMATUCCI (9-27-1938)
350 Governor Wentworth Highway
Wolfeboro, NH 03894
569-2429.

MALONEY told me that on November 12, 2003, she and AMATUCCI went before JUDGE JAMES O'NEIL at the Superior Court in Ossipee in regards to a hearing on a Stalking Order. The order that was effective on November 12, 2003, stated in paragraph 1 the following:

"That the parties are enjoined from having any contact or communication with the other respective party by any means **or with that parties' relatives or members of that parties' household**. This Order remains in effect pending further Order of the Court." (Please see order.)

BOLDUC received a certified mail letter and an uncertified mail letter addressed to him from AMATUCCI on November 15, 2003 at approximately 3:00 p.m. Both letters are the same exact letter. Apparently AMATUCCI was making sure the letter reached him. The letter is a clear violation of the order in that Bolduc is a "relative" of MALONEY, being the brother of MALONEY. BOLDUC owns the property directly behind the property of AMATUCCI. The reason for her writing the letter is to demand that BOLDUC pay her the sum of $1000 for two outhouses that were on his property. The outhouses were destroyed by BOLDUC on the recommendation of his homeowner's insurance company because of the fact they were on wetlands and they were unsafe.

James O'Brien                                                        11/22/03
                                                                        Date

PSI Group, Inc. (781) 297-3770  17004 09

SET TYPEWRITER SPACING AT 1½



Docket#_____ TN#_____

# State of New Hampshire
## COMPLAINT

☐ **DOMESTIC VIOLENCE RELATED**

☐ **VIOLATION**   ☒ **CLASS A**  **MISDEMEANOR**   ☐ **FELONY**
　　　　　　　　 ☐ **CLASS B**

YOU ARE HEREBY NOTIFIED TO APPEAR BEFORE SAID COURT AT___12___O'CLOCK IN THE AM/PM ON _January 7_ YR. _2004_ UNDER PENALTY OF LAW TO ANSWER TO A COMPLAINT CHARGING YOU WITH THE FOLLOWING OFFENSE:

TO THE ..District.........COURT, COUNTY OF ..Carroll......

### THE UNDERSIGNED COMPLAINS THAT: PLEASE PRINT

NAME... Amatucci.........Josephine...................S....
　　　　　Last Name　　　　　　First Name　　　　　　　　Mi

..350 Governor Wentworth Highway Wolfeboro, NH 03894..
　Address　　　　　　　　　　　　　　　State　　　　　　　Zip

DOB.9/27/1938OPLIC.#..09AIJ38271..(NH)................
　　　　　　　　　　　　　　　　　　　WRITE OUT

| F | W | 5P7 | 165 | Brown | Brown |
|---|---|-----|-----|-------|-------|
| Sex | Race | Height | Weight | Color Hair | Color Eyes |

☐ COMM. VEH.　　☐ COMM. DR. LIC.　　☐ HAZ. MAT.

AT...350 Governor Wentworth Highway Wolfeboro, NH
　　　　　　　　　　　　　　　(Location)

ON THE.13thDAY OF ..November.......YR.2003.at.......... A.M.
　　　　　　　　　　　　　　　　　　　　　　　　　　 PM.

on/at in said county and state, did commit the offense of ....................

.Violation of Protective Order..... contrary to RSA ..173:B-9.

and the laws of New Hampshire for which the defendant should be held to answer, in that the defendant did

knowingly violate a stalking order issued by Judge James O'Neil on November 12, 2003, by writing a letter to Norman Bolduc on November 13, 2003, knowing she was enjoined from having any contact by any means to all members of the Maloney family, which Bolduc is a member.

against the peace and dignity of the State.

_James R. O'Brien_ ....................... Wolfeboro Police .
Complainant　　　　　　　　　　　　　　　　　　　　　 Dept

Personally appeared the above named complainant and made oath that the above complaint by him/her subscribed is, in his/her belief, true.

DATE.... Dec 2, 2003 ..................
　　　　　　　　　　　　　　　　　　　　　Justice of the Peace

AOC 101.045 REV 8/00　　　　　COURT COPY

Ref: **03-5-AR**

n Sunday, December 28, 2003, at approximately 1:50 p.m., Senior Patrolman Charles Hamilton and I went to
50 Governor Wentworth Highway to execute an arrest warrant on

JOSPEHINE AMATUCCI 9/27/1938
350GOVERNOR WENTWORTH HWY
WOLFEBORO, NH 03894
569-2429.

he warrant was for a violation of a Protective Order pursuant to a final Stalking Order issued by Judge James
'Neil of the Carroll County Superior Court on November 12, 2003.  The warrant was made effective December
, 2003, by Judge Robert Varney.

.t APPROXIMATELY 2:05 p.m.,AMATUCCI was arrested without incident.  I placed the handcuffs on her,
ouble locked, and checked for tightness.  AMATUCCI was then escorted to the police cruiser.

.MATUCCI was transported to the Carroll County House of Corrections and relased to staff.  AMATUCCI
sked HAMILTON and I to go back to her reseidence to unlock her residence as her son was coming from
/lassachusetts.  HAMILTON unlcoked the door and left the key inside the residence as asked by AMATUCCI.

'ase closed.

# THE STATE OF NEW HAMPSHIRE
## CARROLL, SS
## SUPPORTING AFFIDAVIT for Request to ISSUE ARREST WARRANT

December 02, 2003                                        WPD #03-453

___

And I, ___Robert Varney___ a (Justice of the Peace within
and for the State of New Hampshire) (Justice of the District Court for Southern
Carroll County) have personally examined the information contained in the above
affidavit, and have orally examined the above applicant.  Based upon such information I
conclude that there (is) (is not) sufficient probable cause for the issuance of the
Arrest Warrant sought.  Therefore, the arrest warrant is (granted) (denied) and the
Arrest Warrant (is) (is not) issued.

___

Name of Magistrate

Justice, District Court for Southern Carroll County
Official Title

___

**Probable Cause is defined as: 'An apparent state of facts found to exist' upon reasonable inquiry
which would induce a reasonably intelligent and prudent man to believe, in a criminal case, that the
accused person had committed the crime charged.**

# THE STATE OF NEW HAMPSHIRE
## DISTRICT COURT of SOUTHERN CARROLL COUNTY
## WARRANT

NO _____

CARROLL, SS

To the Sheriff of any County in the State, or his deputy or any Police Officer
of any City or Town within the State:

WHEREAS: James O'Brien of the Wolfeboro Police Department
Wolfeboro, New Hampshire, in the County of Carroll has exhibited to me,
_____Robert Varney_____, a Justice of the District
Court for Southern Carroll County in the County of Carroll, his complaint,
upon oath charging the crime of
**Violation of Protective Order, 173: B-9**
against **Josephine  S Amatucci, DOB: 09/27/1938**
     of   **350 Gov Wentworth Hwy, Wolfeboro  NH  03894**
in the County of Carroll

WE COMMAND YOU to take Josephine  S Amatucci, DOB: 09/27/1938
(if found to be in your precinct) and bring her before the District Court of
Southern Carroll County.

Dated December 02, 2003

_____
Justice of the District Court for Southern Carroll County

CARROLL, SS  _12/29/03_____ 2003

I have arrested Josephine  S Amatucci, DOB: 09/27/1938
and now have her before the District Court of Southern Carroll County, as
commanded.

_James O'Brien_
Name of Officer

_Patrolman_
Title of Officer

WPD #03-453

DEC 3 1 2003

**PLAINTIFF'S EXHIBIT**
/2



**STATE OF NEW HAMPSHIRE**

Carroll

District Court of Carroll Cnty
96 Water Village Road - Box 2
Ossipee, NH 03864
603 539-4561

To: New Hampshire Public Defender
408 Union Avenue
Laconia, NH 03246

RECEIVED
APR 2 2 2004

State Vs. Josephine S. Amatucci
Docket No.   03-CR-02708

**NOTICE OF HEARING - CRIMINAL**

The above entitled case has been scheduled for the following:
Date:  **4/30/2004**            At: **So Carroll Cty District Court**
Time:  **1:00 pm**                  **96 Water Village Rd**
                                    **Room 2**
                                    **Ossipee, NH  03864**
For: Motion Hearing            Violation of Protective Order; Penalty

If you are charged with a motor vehicle violation, other than DWI, and
are unable to appear or wish to change your plea to guilty or no
contest, you must notify the court in writing at least ten (10) days
prior to the above date.  You should send a copy of your notification
to the prosecutor.  The court will inform you of the proper procedure.

When a person pleads guilty or is convicted after trial the court will
require all fines imposed to be paid in full immediately.

Please advise clients, witnesses, and others that it is a class B
felony to carry a firearm or other deadly weapon as defined in
RSA 625:11,V in a courtroom or area used by a court.

        FAILURE TO APPEAR OR PROPERLY OBTAIN A CONTINUANCE
        BY THE COURT MAY RESULT IN AN ORDER FOR YOUR ARREST.

04/15/2004      /s/ Jean M. Flayhan
Date            Clerk of Court

RSA 599-1-c: Any person charged with any violation may, at least 5 (five) days prior to trial, request the district
or municipal court that a sound recording be kept of all proceedings in the trial.  If such a request is made, the
district or municipal court shall make the sound recording at no cost to the person requesting it.
RSA 502 A:27-d: If you are charged with a Class B misdemeanor you are entitled to a sound recording of the proceed-
ings at the state's expense. You must make a written request to the clerk for a sound recording at least five days
prior to any hearing.

(EMD)
cc:  Wolfeboro Police Dept.              James Godron, Esq.

AOC Form CTCRP010 (Rev. 03/24/1999)

# New Hampshire Public Defender

PENDAQ 800-631-6989

PLAINTIFF'S
EXHIBIT
_13_

408 UNION AVE., LACONIA, NH 03246            TELEPHONE: (603) 524-1831   FAX: (603) 524-1852

May 17, 2004

Ms. Josephine Amatucci
P.O. Box 272
Wolfeboro Falls, NH 03896

     RE:   State v. Josephine Amatucci, Docket #: 03-CR-2708

Dear Josephine:

    I am writing to summarize the disposition of your case.  As you will recall, you appeared in Ossipee District Court on April 30, 2004, for a scheduled motion hearing on a misdemeanor charge of Violation of a Stalking Order.  After the hearing, the Court dismissed the charge against you.  This means that you will not be prosecuted for that charge.

    As you know, please be advised that under the current status of the stalking order, Norman Bolduc would be included as a relative of Pauline Maloney.  Please do not have any further correspondence with any of them until the issues are resolved at your hearing in Belknap County Superior Court.  If any legal action needs to be taken, I would ensure that you consult with an attorney to file pleadings on your behalf rather than effectuating any contact through yourself.  I would urge you to contact me prior to instituting any action so I can clarify any criminal issues that may exist surrounding contact.

    I wish you the best of luck.  If I can be of any further assistance, please do not hesitate to contact me.

Sincerely,

Jesse Friedman
N.H. Public Defender

Dismissed

JF/tsp

**THE STATE OF NEW HAMPSHIRE**

**Carroll Superior Court**

96 Water Village Road - Box 3
Ossipee, NH  03864
603 539-2201

PLAINTIFF'S
EXHIBIT

_14_

PENGAD 800-631-6989

**NOTICE OF DECISION**

JOSEPHINE AMATUCCI
PO BOX 272
WOLFEBORO FALLS NH 03896

**03-E-0080 Pauline Maloney v Josephine Amatucci**

Enclosed please find a copy of the Court's Order dated 5/14/2004
relative to:

**Further Order on Stalking Petition**

**copy attached**

05/17/2004                                      Samuel Farrington
                                               Clerk of Court

cc:  Pauline Maloney

AOC Form SUCP050 (Rev. 09/27/2001)

# The State of New Hampshire

## CARROLL COUNTY                                    SUPERIOR COURT

JOSEPHINE AMATUCCI

v.

PAULINE MALONEY

03-E-081

and

PAULINE MALONEY

v.

JOSPEHINE AMATTUCI

03-E-080

### ORDER

Further hearing held in reference to the two Stalking Petitions submitted by the
respective parties in District Court which were transferred without rulings to this Court by
Order (dated 07-10-03-Varney-J.).  Subsequent to offers of proof by the parties
representing themselves pro se, the Court renders the following determination(s).

By way of brief background, subsequent to a hearing held on November 12, 2003,
an Order encompassing what was deemed to be the agreement of the parties was
directed whereby the parties were enjoined from having any contact or communication
with the other respective party by <u>any</u> means or <u>with that party's relatives or members of
the party's household.</u>    At this hearing, the party-Josephine Amatucci indicates that the

agreement encompassed the "family" as opposed to the party's relatives or members of that party's household.

Accordingly, by way of clarification, if same is necessary, the Court directs the following provision(s):

1) That the parties are enjoined from having <u>any</u> contact or communication with the other respective party by <u>any</u> means or with that parties' family.  This Order shall remain in effect pending further Order of the Court.   Further, this Order shall not preclude an attorney for any of the respective parties from having contact with the other respective party for legitimate purposes related to counsel's representation of said party.

All earlier Orders, not inconsistent with the above, shall remain in full force and effect.


SO ORDERED.

DATED: ___5/14/04_____         _____
                                   **JAMES D. O'NEILL, III**
                                   **Presiding Justice**

2

her house is behind her car down the road

PLAINTIFF'S
EXHIBIT
15A
PENGAD 800-631-6989



BEACH



Highway blocking my Driveway
Notice spaces to Park Behind her car
& across the road



PLAINTIFF'S
EXHIBIT
15-B
PENGAD 800-631-6989









PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
16

## Experience a richer, deeper Internet.

**Dictionaries:** General | Computing | Medical | Legal | ✓Encyclopedia

Ads by Google

**Meet Single Parents Free**
Single Parents Looking for Partners Find the Right Romantic Partner
www.singlepartners.com

**Dating Rich, Cute Singles**
Meet hundreds of thousands of affluent, gorgeous singles now.
www.MillionaireMatch.com

**Single Parents - Pics**
Dating Ads Galore - Get a Date Now Make New Connections. Join Free.
singleparentsmatcher.com

**Meet Single Parents Here**
Free guest profile, photo gallery, more. Meet single parents now!
www.SingleParentsMingle

Word: | family | Word ▾ | Look it up

## Family
Fam'i·ly

**Noun 1. family** - a social unit living together; "he moved his family to Virginia"; "It was a good Christian household"; "I waited until the whole house was asleep"; "the teacher asked how many people made up his home"

|household, menage, house, home

|conjugal family, nuclear family - a family consisting of parents and their children and grandparents of a marital partner

|extended family - a family consisting of the nuclear family and their blood relatives

|foster family - the family of a fosterling

|foster home - a household in which an orphaned or delinquent child is placed (usually by a social-service agency)

|menage a trois - household for three; an arrangement where a married couple and a lover of one of them live together while sharing sexual relations

|social unit, unit - an organization regarded as part of a larger social group; "the coach said the offensive unit did a good job"; "after the battle the soldier had trouble rejoining his unit"

**2. family** - primary social group; parents and children; "he wanted to have a good job before starting a family"

|family unit

|kin group, kindred, kinship group, clan, kin, tribe - group of people related by blood or marriage

|mates, couple, match - a pair of people who live together; "a married couple from Chicago"

|man and wife, married couple, marriage - two people who are married to each other; "his second marriage was happier than the first"; "a married couple without love"

|Marx Brothers - a family of United States comedians consisting of four brothers with an anarchic sense of humor

|child, kid - a human offspring (son or daughter) of any age; "they had three children"; "they were able to send their kids to college"

|parent - a father or mother; one who begets or one who gives birth to or nurtures and raises a child; a relative who plays the role of guardian

|sib, sibling - a person's brother or sister

**3. family** - people descended from a common ancestor; "his family has lived in Massachusetts since the Mayflower"

|kinfolk, kinsfolk, phratry, family line, sept, folk

|people - members of a family line; "his people have been farmers for generations"; "are your people still alive?"

|homefolk - the people of your home locality (especially your own family); "he wrote his homefolk every day"

|house - aristocratic family line; "the House of York"

|dynasty - a sequence of powerful leaders in the same family

|gens, name - family based on male descent; "he had no sons and there was no one to carry on his name"



what nation and religion soever they be, Christian, Jews, Mahomites, or Turks, and heathen," to join in a great fellowship of peace, the Family of Love, giving up all contention over dogma and seeking to be incorporated into the body of Christ.

Niclaes gained many followers, among them the great publisher Christophe Plantin, who surreptitiously printed a number of Niclaes' works. Niclaes apparently made two visits to England, where his sect had the largest following. Elizabeth I issued a proclamation against the Family of Love in 1580, and James I believed it to have been the source of Puritanism. The sect did not survive after the Restoration of the English monarchy in 1660, but according to George Fox, a British preacher and the founder of the Society of Friends (or Quakers), some remaining Familists later became associated with the Quakers.

**Famille, Pacte de,** English FAMILY COMPACT, any of three defensive alliances (1733, 1743, and 1761) between France and Spain, so called because both nations were ruled by members of the Bourbon family. The Pactes de Famille generally had the effect of involving Spain in European and colonial wars on the side of the French Bourbons (e.g., the Seven Years' War, 1756–63). Spain also followed French policy in the U.S. War of Independence (1775–83). After the outbreak of the French Revolution, Charles IV of Spain sought to intervene to save Louis XVI and, after his execution, engaged Spain in the war of 1793–95, ending in the humiliating Peace of Basel. After the restoration of the French Bourbons in 1814–15, the French intervened in 1823 to restore the authority of Ferdinand VII of Spain.

**famille rose** (French: "rose family"), group of Chinese porcelain wares, especially developed during the reign of Yung-cheng (1722–35) in the Ch'ing dynasty, characterized by decoration painted in opaque overglaze colours of the rose family, chiefly shades of pink and



Famille rose porcelain vase of *yang ts'ai* ware, Ch'ing dynasty, Yung-cheng reign (1722–35); in the Victoria and Albert Museum, London
By courtesy of the Victoria and Albert Museum, London

carmine. These colours are known to the Chinese as *yang ts'ai* ("foreign colours") because they were first introduced from Europe (c. 1685). By the time of the reign of Yung-cheng they were favoured over the translucent famille verte overglaze colours previously used.

**famille verte** (French: "green family"), group of Chinese porcelain wares made during the K'ang-hsi period (1661–1722) of the Ch'ing dynasty and characterized by decoration painted in a colour range that includes yellow, blue, red, purple, and green, the latter sometimes used for the ground. The verte palette

Famille verte porcelain jardiniere, Ch'ing dynasty, K'ang-hsi reign (1661–1722); in the Museum of Fine Arts, Boston
By courtesy of the Museum of Fine Arts, Boston, Hoyt Collection

used with a yellow ground is famille jaune; used with a rich greenish-black ground, it is famille noire.

**family:** *see under* descriptive word (e.g., extended family; joint family; nuclear family), except as below.

**family,** a group of persons united by the ties of marriage, blood, or adoption, constituting a single household and interacting with each other in their respective social positions of husband and wife, mother and father, son and daughter, brother and sister. The family group is often confused with the household because it constitutes a single household, but boarders and roomers sharing a common residence may be included in a household. The family is also sometimes confused with a kindred because of the unity of blood lines, but a kindred may be divided into several households. Frequently the family is not differentiated from the marriage pair, but the essence of the family group is the parent-child relationship, which may be absent from many marriage pairs. In its institutional aspects the family is also frequently confused with the institution of marriage, the complex of customs regulating the sexual relations between the cohabiting pair of adults within the family group. Marriage defines the procedures for establishing and terminating the husband-wife relation, as well as the reciprocal obligations and the accepted restrictions upon its personnel.

A brief treatment of family follows. For full treatment, *see* MACROPAEDIA: Family and Kinship; Family Law.

A family, in the simplest terms, is the union of a man and a woman (almost always from different lineages and not related by blood) along with their offspring, usually living in a private and separate dwelling. This type of living arrangement, more specifically known as the nuclear family, is believed to be the oldest of the various types of families in existence. Sometimes the nuclear family is extended to include not only the parents and the unmarried children living at home but also children that have married, their spouses, and their offspring; such an arrangement is called an extended family.

*Socioeconomic aspects of marriage.* The family performs various valuable functions for its members. Perhaps most important of all, it provides for emotional and psychological security, particularly through the warmth, love, and companionship that living together generates between spouses and in turn between them and their children. The family also provides a valuable social and political function by institutionalizing procreation and by providing guidelines for the regulation of sexual conduct. The family additionally provides such other socially beneficial functions as the rearing and socialization of children, along with such humanitarian activities as caring for its members when they are sick or disabled. On the economic side, the family provides food, shelter, clothing, and physical security for its members, many of whom may be too

young or too old to provide for the basic necessities of life themselves. Finally, on the social side, the family may serve to promote order and stability within society as a whole.

Historically, in most cultures, the family has been patriarchal, or male-dominated. Perhaps the most striking example of the male-dominated family is the description of the family given in the Old Testament, where the male heads of the clans were allowed to have several wives as well as concubines. As a general rule, the women of the Old Testament had a rather low status. In Roman times the family was still patriarchal, but polygamy was not practiced, and in general the status of women was somewhat improved over that suggested in the Old Testament, although they still could not manage their own affairs. The Roman family was an extended one. The family as it existed in medieval Europe was male-dominated and extended.

The Industrial Revolution and the accompanying urbanization spawned—and continues to spawn—many changes in family structure. Industrialization and urbanization prompted a sharp change in life and occupational styles. Many people, particularly unmarried youths, left the farms and went to urban centres to become industrial workers. This process led to the dissolution of many extended families.

The modern family that has emerged since the Industrial Revolution is rather different from that which existed earlier. For instance, patriarchal rule has slowly given way to a greater equality between the sexes. Similarly, stereotyping of male and female roles within the family is breaking down. No longer is caring for the home and children the exclusive duty of the female, nor earning a living and pursuing a public life the exclusive domain of the male. The structure of the family is also changing in that some couples choose not to marry legally and instead elect to have their children out of wedlock; many of these informal relationships tend to be of short duration, and this has led to a rapid increase in the number of one-parent households.

The modern family is today more of a consuming as opposed to a producing unit, and the members of the family work away from home rather than at home. Public authorities, primarily governmental ones, have assumed many of the functions that the family used to provide, such as caring for the aged and the sick, educating the young, and providing for recreation. Technological advancements have made it possible for couples to decide if and when they want to have children.

*Family law.* Family law varies from culture to culture, but in its broadest application it defines the legal relationships among family members as well as the relationships between families and society at large. Some of the important questions dealt with in family law include the terms and parameters of marriage, the status of children, and the succession of property from one generation to the next. In nearly every case, family law represents a delicate balance between the interests of society and the protection of individual rights.

The general rule in marriages until modern times was the legal transfer of dependency, that of the bride, from father to groom. Not only did the groom assume guardianship, he usually assumed control over all of his wife's affairs. Often, the woman lost any legal identity through marriage, as was the case in English common law. There have been exceptions to this practice. Muslim women, for instance, had considerable control over their own personal property. The concept of dowries, an amount of money or property given to the husband with the bride in compensation for her dependency, has been practiced in many countries.



PLAINTIFF'S
EXHIBIT
17-A

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Josephine Amatucci

        v.                                Civil No. 05-cv-259-SM

Charles Hamilton, et al.

                        O R D E R

      Before the Court is Josephine Amatucci's complaint[1] alleging

that the defendants have violated her Fourth and Fourteenth

Amendment rights to due process by subjecting her to false arrest

---

      [1]Amatucci has filed a complaint (document no. 1), and three
documents titled "Addendum to Complaint" (document nos. 7, 9 &
11).  Although not strictly in compliance with the court's local
rules governing "Motions to Amend," see Rule 15.1 of the Local
Rules of the United States District Court for the District of New
Hampshire ("LR"), I will accept these four documents in the
aggregate as the complaint in this matter.  Amatucci is advised,
however, that all further amendments must comport with the local
rule, which states:

            (a) A party who moves to amend a filing shall (i)
            attach the proposed amended filing to the motion to
            amend, (ii) identify in the motion or a supporting
            memorandum any new factual allegations, legal claims,
            or parties, and (iii) explain why any new allegations,
            claims, or parties were not included in the original
            filing.

            (b) Any amendment to a pleading, whether filed as a
            matter of course or upon a motion to amend, shall
            reproduce the entire filing as amended and may not
            incorporate any prior filing by reference, except by
            leave of court.

LR 15.1.

and detention.  Because Amatucci is proceeding both *pro se* and *in forma pauperis*, the matter is before the Court for preliminary review to determine whether the complaint states any claim upon which relief might be granted.  See 28 U.S.C. § 1915(e)(2); United States District Court for the District of New Hampshire Local Rule 4.3(d)(1)(B).

As fully discussed in the Report and Recommendation issued simultaneously with this Order, and without further comment on the merits of the claims, I find that Josephine Amatucci has stated a claim upon which relief may be granted for false arrest and detention against defendants James O'Brien and Charles Hamilton.[2]  Accordingly, I order that the complaint (document nos. 1, 7, 9 & 11) be served on those Defendants.  Plaintiff has already submitted summons forms for each of the defendants upon whom service is authorized.  The Clerk's office is directed to issue the summonses against defendants O'Brien and Hamilton and to forward to the United States Marshal for the District of New Hampshire (the "U.S. Marshal's office") the summonses and copies of the complaint (document nos. 1, 7, 9 & 11), the Report and

---

[2]In the Report and Recommendation issued this date, I have recommended the dismissal of all other claims and defendants in the complaint.

2



PLAINTIFF'S
EXHIBIT
17-B

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Josephine Amatucci</u>

    v.                                 Civil No. 05-cv-259-SM

<u>Charles Hamilton, et al.</u>

### REPORT AND RECOMMENDATION

Before the Court is Josephine Amatucci's complaint[1] alleging

a number of claims, including her claim that the defendants have

violated her Fourth and Fourteenth Amendment rights to due

---

[1]Amatucci has filed a complaint (document no. 1), and three documents titled "Addendum to Complaint" (document nos. 7, 9 & 11). Although not strictly in compliance with the court's local rules governing "Motions to Amend," <u>see</u> Rule 15.1 of the Local Rules of the United States District Court for the District of New Hampshire ("LR"), I will accept these four documents in the aggregate as the complaint in this matter. Amatucci is advised, however, that all further amendments must comport with the local rule, which states:

> (a) A party who moves to amend a filing shall (i) attach the proposed amended filing to the motion to amend, (ii) identify in the motion or a supporting memorandum any new factual allegations, legal claims, or parties, and (iii) explain why any new allegations, claims, or parties were not included in the original filing.

> (b) Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, shall reproduce the entire filing as amended and may not incorporate any prior filing by reference, except by leave of court.

LR 15.1.

process by subjecting her to false arrest and detention.  Because

Amatucci is proceeding both *pro se* and *in forma pauperis*, the

matter is before the Court for preliminary review to determine

whether the complaint states any claim upon which relief might be

granted.  See 28 U.S.C. § 1915(e)(2); LR 4.3(d)(1)(B).

Standard of Review

Under this Court's local rules, when a nonincarcerated

plaintiff commences an action both *pro se* and *in forma pauperis*,

the magistrate judge is directed to conduct a preliminary review

and to prepare a report and recommendation determining whether

the complaint or any portion thereof should be dismissed because:

> the allegation of poverty is untrue, the action is
> frivolous, malicious, or fails to state a claim upon
> which relief may be granted, or seeks monetary relief
> from a defendant who is immune from such relief under 28
> U.S.C. § 1915(e)(2); or it fails to establish subject
> matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(1)(B).  In conducting the preliminary review, the Court

construes *pro se* pleadings liberally.  See Ayala Serrano v.

Lebron Gonzales, 909 F.2d 8, 15 (1st Cir. 1990) (following

Estelle v. Gamble, 429 U.S. 97, 106 (1976) to construe *pro se*

pleadings liberally in favor of the *pro se* party).  "The policy

behind affording *pro se* plaintiffs liberal interpretation is that

if they present sufficient facts, the court may intuit the

2

correct cause of action, even if it was imperfectly pled." <u>Ahmed</u>
<u>v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997), <u>cert. denied</u>,
<u>Ahmed v. Greenwood</u>, 522 U.S. 1148 (1998).

At this preliminary stage of review, all factual assertions
made by the plaintiff and inferences reasonably drawn therefrom
must be accepted as true.  <u>See</u> <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3
(1st Cir. 1996) (stating the "failure to state a claim" standard
of review and explaining that all "well-pleaded factual
averments," not bald assertions, must be accepted as true).  This
review ensures that *pro se* pleadings are given fair and
meaningful consideration.  <u>See</u> <u>Eveland v. Dir. of C.I.A.</u>, 843
F.2d 46, 49 (1st Cir. 1988).

<u>Background</u>

Josephine Amatucci is a resident of Wolfeboro, New
Hampshire.  She has lived at her property there for twelve years.
During that time, Amatucci has waged an ultimately successful
campaign to have the Town of Wolfeboro recognize her right to
restrict parking in front of her residence, although she lives on
a road that provides public beach parking.  Prior to receiving
official sanction for her parking rights, however, Amatucci
frequently found herself at odds with both the local police and

3

her neighbors regarding the location of parked cars in relation
to her property.  On more than one occasion, Amatucci found
herself requesting help from the police to prevent cars from
blocking her driveway, but not receiving the requested help
because the police were under the impression that Amatucci was
attempting to control access to public parking.  Ultimately,
these and other run-ins involving the neighbors' use of her
property resulted in Amatucci having a contentious relationship
with her neighbors and the Wolfeboro Police Department.

The August 16, 2002 Incident

On August 16, 2002, at 5:00 p.m., Amatucci noticed that
Kelly Fitzgerald, a relative of one of her neighbors, parked her
car in a manner that blocked Amatucci's driveway.  Amatucci asked
Fitzgerald to move her car, but Fitzgerald refused.  Amatucci
called the police.  A boy who was a member of Amatucci's
neighbor's family, and who appeared to be too young to legally
drive, then got into Fitzgerald's car and attempted to move it.
In the process, the boy hit a cinder block that Amatucci had
placed on the ground to protect people from an iron mailbox rod
she had placed in the ground but that did not yet have a mailbox
on it.  When the boy hit the cinder block, it shattered,

4

resulting in a small piece of the block lodging itself in the car's wheel well so that the car couldn't move.  When Amatucci expressed her amusement at this turn of events, four members of Amatucci's neighbor's family, including Fitzgerald, came onto Amatucci's driveway and proceeded to kick and punch Amatucci and throw stones at her.

Amatucci got away from the individuals who were assaulting her and ran inside her house to call the Wolfeboro Police Department for assistance.  In response to her call, Officer Charles Hamilton responded to the scene while the neighbors were still present in Amatucci's driveway.  Amatucci told Hamilton that she wanted to press criminal charges against her attackers.  Instead of assisting her as a crime victim, however, Amatucci reports that Hamilton yelled at her.  Because of Hamilton's reaction, Amatucci again called the Wolfeboro Police Department and spoke with Wolfeboro Police Chief Brian Black who seemed to be sympathetic to Amatucci's complaints and offered to help resolve the difficulties that Amatucci had with Hamilton.  However, Amatucci claims that Black did not follow through on his promise to assist her and, in fact, she did not hear from him again regarding this matter.

5

The Wolfeboro Police subsequently took the position that
Amatucci was the aggressor against her neighbors and sought to
prosecute her for damage to Fitzgerald's car and for assault.
Hamilton obtained a warrant to arrest Amatucci on those charges
and, on November 7, 2002, Hamilton entered Amatucci's home and
arrested her on criminal mischief and assault charges pursuant to
that warrant.[2]

Amatucci claims that Hamilton must have failed to present
exculpatory evidence to the judge issuing the arrest warrant,
specifically, Amatucci's version of events and the statement of
an impartial witness to the events of August 16, 2002.  Further,
Amatucci alleges that Hamilton falsely obtained the warrant by
stating to the judge that a cinder block had been placed on the
wheel well by Amatucci, damaging the car, when in fact he had
simply seen a fragment of cinder block inside the wheel well
after the fact, as Hamilton later confirmed.

Amatucci states that after being arrested, she went to the
Wolfeboro Police Department to confront Black regarding her

---

[2]The complaint alleges initially that Hamilton was not in
possession of a valid warrant.  However, Amatucci has appended an
affidavit from Judge Varney to her complaint stating that the
warrant was, in fact, signed and issued by Judge Varney on
October 30, 2002 while he was at his law offices.

6

objection to being prosecuted.  Amatucci claims that Black did

not answer her and that Officer James O'Brien was present and

that he stood by during the confrontation with his hand resting

on his gun.  Amatucci further alleges that the prosecutor did not

subpoena the sole exculpatory witness to testify at Amatucci's

trial.  Although the complaint is unclear as to why, it appears

that the charges against Amatucci were ultimately dismissed.[3]

The November 2003 Incident

     Amatucci's friction with her neighbors was not limited to

Kelly Fitzgerald's relatives.  Amatucci also had difficulty with

neighbors on the other side of her property, Pauline and Robert

Maloney, regarding neighborhood parking.  Further, Amatucci has

had disputes with Norman Bolduc, who lives behind her, regarding

two outbuildings Amatucci claims that she owns but that are

located on Bolduc's property as well as Bolduc's parking his golf

---

[3]Amatucci alleges that Fitzgerald and other witnesses failed
to appear in Court.  Amatucci also submits a statement from
another individual indicating that the witnesses failed to appear
to prosecute the case against Amatucci.  However, Amatucci has
also submitted copies of two court orders with her complaint that
indicate that her "record of attempted criminal mischief" and her
"record of simple assault" were annulled on June 23, 2003.  I
presume that it is her arrest and charge that were annulled from
her record, since Amatucci claims no conviction was ever entered
in these matters.

7

cart in such a manner as to infringe Amatucci's property.  Bolduc
is Pauline Maloney's brother.

    According to Amatucci, her difficulties with the Maloneys
arose because the Maloneys repeatedly parked in such a way so as
to block Amatucci's driveway access.  Amatucci claims the
Maloneys parked this way to retaliate against Amatucci for
contacting the police when the Maloneys' grandchildren rode golf
carts on Amatucci's driveway late at night.

    Amatucci alleges that she has been subjected to ongoing
harassment from the Maloneys over the years, but the police have
done nothing to protect Amatucci's right not to be harassed.
Finally, the police told Amatucci to go to court and attempt to
obtain a "stalking order" against the Maloneys, which Amatucci
did.  The Maloneys simultaneously sought a "stalking order"
against Amatucci.  Amatucci and the Maloneys appeared in the
Carroll County Superior Court on November 12, 2003, for a hearing
on their mutual requests.  Because both parties desired to have
no contact with each other, the judge, from the bench, authorized
orders restraining both parties from contacting or communicating
with each other or each other's families.  Amatucci interpreted

the word "family" to mean that she was not to contact the Maloneys or any member of their household.

Prior to the November 12 hearing, Amatucci had sought the assistance of legal counsel to resolve the outbuilding issue with Bolduc.  Because the lawyers had not yet acted on her behalf, Amatucci took it upon herself to write a letter to Bolduc insisting on payment for damages Bolduc had caused to the outbuildings in order to avoid litigation over the issue. Amatucci brought the letter with her to Court on November 12, thinking that Bolduc might appear in court with the Maloneys. When Bolduc did not appear, Amatucci mailed the letter to Bolduc on November 13, 2003.

On November 13, 2003, the Superior Court issued a written Order on the requests for stalking orders.  The written order prohibited Amatucci and the Maloneys from contacting or communicating with each other or each other's relatives. Amatucci received this written Order on November 15, 2003, two days after she had mailed the letter to Bolduc.

On November 18, 2003, Pauline Maloney and Bolduc took Amatucci's letter to the Wolfeboro Police Department seeking Amatucci's prosecution for violating the Superior Court's order.

9

On December 29, 2003, defendants O'Brien and Hamilton arrested Amatucci pursuant to an arrest warrant for violating the stalking order by writing to Bolduc.

Amatucci claims that O'Brien and Hamilton did not have facts supporting probable cause to arrest her to present to the issuing judge in support of the arrest warrant.  Amatucci alleges that the officers failed to include all of the material facts to the issuing judge in support of their request for an arrest warrant. Amatucci alleges that to properly obtain an arrest warrant, the officers would have had to aver that Amatucci knew, on November 13, 2003 when she sent the letter, that the stalking order prohibited her from contacting the Maloneys' relatives, and not just the members of their household.  Accordingly, Amatucci alleges that the defendant officers must have omitted the fact that Amatucci, on November 13, 2003, had only been told not to contact "family members" which was properly interpretable as "household members."  Amatucci claims that if all of the material facts known to O'Brien and Hamilton had been prseented to the judge, the *mens rea* for the offense of knowingly violating a court order would have been negated.  Therefore, she alleges,

10

probable cause would not have been established and a warrant
would not have issued.

Amatucci claims that at her arraignment on this matter,
Judge Varney advised the prosecuting officers that they would
have to prove a particular definition of "family" in order to
convict Amatucci.  Amatucci alleges that giving this advice to
the officers was outside of the Judge's proper judicial capacity
and rendered Judge Varney a coconspirator in her false arrest and
detention.

### Discussion[4]

A government official may be held personally liable under 42
U.S.C. § 1983 if, acting under color of state law, the official
caused the deprivation of a federal constitutional or statutory
right.  Kentucky v. Graham, 473 U.S. 159, 166 (1985).[5]  Amatucci

---

[4]The claims as identified and discussed herein will be
considered to be the claims raised in the complaint for all
purposes.  If plaintiff disagrees with this identification of the
claims, she must do so by filing a proper objection to this
Report and Recommendation or by properly filing a motion to amend
the complaint.

[5]42 U.S.C. § 1983 states, in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of
> the United States or other person within the

11

alleges that she was subjected to false imprisonment and detention by O'Brien and Hamilton when they twice secured her arrest pursuant to arrest warrants that, she claims, were obtained by the defendant officers' failure to communicate material exculpatory facts to the judge issuing the warrants. Amatucci claims that these omissions resulted in the violation of her Fourth Amendment rights as her person was seized by the arresting officers pursuant to improperly obtained arrest warrants.[6]

Amatucci further alleges claims against the remaining named defendants to this action.  Amatucci alleges that the Wolfeboro police prosecutor, Dennis Davey, violated her constitutional due process rights by failing to subpoena an exculpatory witness to

---

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

[6]The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

12

testify at Amatucci's trial.  Amatucci also alleges that Judge

Robert Varney violated her constitutional rights by giving advice

to the Wolfeboro Police Department, an act which she claims lies

outside the judicial function.  Finally, Amatucci seeks to state

a claim against Wolfeboro Police Chief Brian Black, the Wolfeboro

Police Department, and the Town of Wolfeboro, for improperly

training and supervising the police officer defendants in this

case, directly resulting in a violation of Amatucci's rights by

those officers.  I will discuss and address these claims in turn.

1.   <u>False Arrest and Detention Claims Against O'Brien and</u>
     <u>Hamilton</u>

     Presuming the proper issuance of a warrant by a judge in

this case, Amatucci's assertion is that the warrant was issued

based on the misleading impression left by defendants Hamilton

and O'Brien when they intentionally omitted material exculpatory

information from their warrant applications.  "[T]he intentional

or reckless omission of material exculpatory facts from

information presented to a magistrate may . . . amount to a

Fourth Amendment violation."  <u>Burke v. Town of Walpole</u>, 405 F.3d

66, 81 (1st Cir. 2005).  When evaluating allegedly material

omissions from a warrant application, "recklessness may be

13

inferred where the omitted information was critical to the
probable cause determination." Id. (citations omitted).

To support her allegation of a violation of her Fourth
Amendment rights, Amatucci has alleged that Hamilton
misrepresented the nature of the cinder block in Fitzgerald's
wheel well, omitted from his warrant application Amatucci's
version of events, and omitted the statement of a witness that
corroborated certain key elements of Amatucci's story.  While
Amatucci has not filed a copy of the warrant application with her
complaint, she has filed a copy of Hamilton's incident report and
later admissions regarding the size and location of the cinder
block, the neutral witness statement and other documents that
demonstrate a basis for her assumption that material facts were
omitted from the warrant affidavit for the August 2002 arrest.
Accordingly, I find that Amatucci has stated the minimum facts
necessary to state a claim for a Fourth Amendment violation as it
relates to the November 7, 2002 arrest based on an improperly
obtained arrest warrant.

Amatucci has similarly stated her presumption that material
and exculpatory omissions were made by O'Brien and Hamilton to
obtain a warrant for her December 2003 arrest.  Amatucci

14

specifically alleges that because she had not received a written
order clarifying that she was not allowed to contact Bolduc at
the time she mailed him the November 13, 2003 letter, that a
truthful and complete recitation of the facts to the issuing
judge would have belied the fact that the state did not have
sufficient evidence of the *mens rea* for the crime of knowingly
violating a restraining order to support probable cause.
Amatucci claims that the warrant affidavit, which was not
submitted with the complaint, must have omitted the fact that
Amatucci had not yet received notice that contact with all of the
Maloneys' relatives was forbidden by the superior court order.
Amatucci has thus stated the minimum facts necessary to
demonstrate a Fourth Amendment claim for false arrest and
detention against O'Brien and Hamilton for the December 2003
arrest.

In an Order issued simultaneously with this Report and
Recommendation, I will direct that the False Arrest and Detention
claim for the August 2002 arrest be served on Hamilton.  In that
Order, I will also direct that a False Arrest and Detention claim
be served on both O'Brien and Hamilton for the December 2003
arrest.

15

2.   Prosecutorial Immunity

Prosecutors enjoy absolute immunity from suit under Section 1983 for actions taken within the scope of their prosecutorial duties, even when those actions violate a plaintiff's constitutional rights or the suit is premised on malicious prosecution.  Imbler v. Pachtman, 424 U.S. 409, 427 (1976); see Celia v. O'Malley, 918 F.2d 1017, 1019 (1st Cir. 1990).  If the challenged action of the prosecutor is "intimately associated with the judicial phase of the criminal process," it is a function to which absolute immunity applies.  Imbler, 424 U.S. at 430.

Here, Amatucci alleges that by failing to call a witness to provide exculpatory testimony at trial, Davey violated her constitutional rights.  The decision as to what evidence to present at trial is one that falls squarely within the prosecutor's role in the judicial phase of a criminal trial. Accordingly, Davey enjoys absolute immunity from suit for that decision and I recommend that Davey be dismissed as a defendant to this action.

3.   Judicial Immunity

Judges are absolutely immune from suit for conduct within their judicial capacities unless they act (1) outside the scope

16

of their judicial capacity or (2) "in the complete absence of all
jurisdiction." <u>Mireles v. Waco</u>, 502 U.S. 9, 11-12 (1991); <u>Stump
v. Sparkman</u>, 435 U.S. 349, 356 (1978); <u>Boyd v. Biggers</u>, 31 F.3d
279, 284 (5th Cir. 1994).  Amatucci attempts to state a claim
against Judge Varney for acting outside of his judicial capacity
by advising the prosecuting authority that they would have to
prove a particular definition of "family" in order to
successfully prosecute Amatucci.  Although Amatucci characterizes
this statement as "advice" to the prosecuting authority, it
appears from the facts alleged by Amatucci, that Judge Varney was
simply clarifying that the state had the burden of proof for the
*mens rea* of the offense charged.  Discussion of the elements of
an offense charged in his Court, or the burden of proof
applicable in a particular case, is clearly within a judge's
capacity and is a proper exercise of the judicial function.
Accordingly, I find that Judge Varney is absolutely immune from
liability in this action and should be dismissed as a defendant
to this action.

4.   <u>Municipal Liability</u>

Municipalities and local government entities are "persons"
within the meaning of § 1983.  <u>See Monell v. Dep't of Soc.
Servs.</u>, 436 U.S. 658, 690 (1978).  Under New Hampshire law,

17

towns, such as Wolfeboro, are considered local governmental
units.  See N.H. Rev. Stat. Ann. ("RSA") 507-B:1 (1997) (defining
"governmental unit" as "any political subdivision within the
state including any county, city, town . . ., but [not including]
the state or any department or agency thereof.").  In order to
maintain a claim against the town of Wolfeboro, or the Wolfeboro
Police Department, as a municipality under 42 U.S.C. § 1983, the
claim must be grounded upon an unconstitutional municipal custom
or practice and two requirements must be met.  "First, the custom
or practice must be attributable to the municipality, i.e., it
must be 'so well settled and widespread that the policymaking
officials of the municipality can be said to have either actual
or constructive knowledge of it yet did nothing to end the
practice.'"  Miller v. Kennebec County, 219 F.3d 8, 12 (1st Cir.
2000) (quoting Bordanaro v. Mcleod, 871 F.2d 1151, 1156 (1st
Cir.), cert. denied, Everett v. Bordanaro, 493 U.S. 820 (1989)).
Second, the custom must have been the cause of and "the moving
force" behind the deprivation of constitutional rights.  Id. at
1157.  Amatucci has not asserted any facts that demonstrate that
the town of Wolfeboro or the Wolfeboro Police Department engaged
in a custom or policy of allowing or enabling Wolfeboro police
officers to make material omissions in arrest warrant affidavits.

18

I find, therefore, that she has not stated a claim against the
town of Wolfeboro or its police department and I recommend that
they be dismissed as defendants to this action.

5.   <u>Supervisory Liability</u>

    "Supervisory liability under § 1983 cannot be predicated on
a respondeat theory, but only on the basis of the supervisor's
own acts or omissions."  <u>Aponte Matos v. Toledo Davila</u>, 135 F.3d
182, 192 (1st Cir. 1998).  A supervisor must be either "a primary
actor involved in, or a prime mover behind, the underlying
violation."  <u>Camilo-Robles v. Zapata</u>, 175 F.3d 41, 43-44 (1st
Cir. 1999).  There must be "an affirmative link, whether through
direct participation or through conduct that amounts to
condonation or tacit authorization."  <u>Id.</u> at 44.  Here, while
Amatucci has described facts that could be liberally construed to
allege that Black was supportive of Amatucci's arrest and
unwilling to resolve matters directly with Amatucci, she has not
alleged any facts which demonstrate that Black either directly
participated in, condoned, or authorized in any way, the improper
obtaining of an arrest warrant by the omission of material
exculpatory information.  Accordingly, I cannot find that
Amatucci has alleged facts that support a cause of action against

                                19

Black, and I recommend that he be dismissed as a defendant from this action.

## Conclusion

For the reasons discussed herein, I recommend that all claims alleged against defendants Davey, Varney, Black, the town of Wolfeboro, and the Wolfeboro Police Department, and Black be dismissed from this action. In an Order issued simultaneously with this Report and Recommendation, I will direct that Amatucci's false arrest and detention claims be served against defendants Hamilton and O'Brien.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date:      January 20, 2006

cc:        Josephine Amatucci, *pro se*

20